## PARMAN v. PARMAN.

(180 Pac. 906; 185 Pac. 922.)

**Divorce—Appeal—Notice of Appeal—Service upon District Attorney.**

1. In divorce suit, where district attorney was not served with summons, but personally appeared, and his appearance was noted in the record at the trial, an appeal could be taken from the decree rendered without serving him with notice of appeal, since his appearance, though it conferred jurisdiction, did not, in absence of some motion or other pleading filed by him, confer upon state any right to be heard further in the case.

### ON THE MERITS.

**Divorce—Untidiness of Wife not Cruelty.**

2. Where defendant wife bore six children during the 10 years of her married life and did most of the cooking and housework for her husband and the hired men on his large ranch, her untidiness was not ground for divorce, as cruel and inhuman treatment.

   [As to habits or conduct of spouse as cruelty warranting divorce, see note in Ann. Cas. 1918B, 480.]

**Divorce—Charge of Infidelity Cruelty.**

3. Defendant's wife's intimation to plaintiff husband that he had been guilty of improper conduct with another woman *held* not cruel

and inhuman conduct warranting divorce, she having had reasonable grounds for suspicion.

**Evidence—Judicial Notice Taken of Nervous Condition Attending Pregnancy.**

4. It is a well-known fact that in a condition of advanced pregnancy women are more sensitive and more suspicious than they are at other times.

**Divorce—Evidence Insufficient to Show Cruel and Inhuman Treatment by Wife.**

5. Husband *held* not entitled to divorce for cruel and inhuman treatment.

From Wheeler: FRED W. WILSON, Judge.

In Banc.

This is a suit for divorce. The district attorney was not served with summons, but personally appeared, and his appearance was noted in the record at the trial. There was a decree dismissing the suit, and plaintiff appeals. The district attorney was not served with notice of the appeal, and defendant moves to dismiss the appeal for that reason. OVERRULED.

*Messrs. Kimball & Ringo,* for the motion.

*Messrs. Angell & Fisher, contra.*

PER CURIAM.—1. In *De Foe* v. *De Foe,* 88 Or. 549 (169 Pac. 128, 172 Pac. 980), this court, speaking of the appearance of a district attorney without service of summons, or filing any pleading, said:

"While such appearance of the district attorney confers jurisdiction, it does not in the absence of some motion or other pleading filed by him, confer upon the state any right of appeal, or any right to be heard further in the case," etc.

We still adhere to this statement of the law, and the motion to dismiss will be overruled.

OVERRULED.

Affirmed December 16, 1919.

## ON THE MERITS.

(185 Pac. 922.)

The plaintiff and defendant were married at Condon, Oregon, on October 3, 1907, and lived together as man and wife until about September, 1917. During that time six children were born to the plaintiff and defendant, four of them still living and two were born dead. During the first years of their married life the plaintiff and defendant seemed to have gotten along moderately well. There was perhaps some bickering and disagreement, but probably not more than often occurs in the marriage relation. During the last year or two, however, there was more serious quarreling and at the time of their separation it seems to have been mutually agreed that the defendant should remove with two of the children to Portland, while the plaintiff should remain at their home, which was then in Wheeler County.

The divorce is sought by the plaintiff on the grounds of alleged cruel and inhuman treatment. It is claimed that during their entire married life the defendant was a poor housekeeper—extravagant in the management of the house—and untidy in her person and in her manner of housekeeping and in the taking care of the children, and that she was also of a jealous and nagging disposition. It is also alleged that just prior to the separation she falsely accused the defendant of improper relations with another woman.

The defendant claims that her removal to Portland was temporary and that she never did agree to a final and permanent separation.

Shortly after her removal to Portland, however, she and plaintiff executed an agreement for a division of the property, by which she was to receive $5,000, and he was to have the remainder of the property they had accumulated during their marriage, and shortly afterwards the $5,000 was actually paid over by the plaintiff to the defendant.

There was nothing in the contract in relation to the separation of the parties, and it had no relation to the divorce. It is provided therein:

"It is understood and agreed however that in the event a decree of divorce is not granted, this property adjustment shall be binding and shall have the same force and effect as though a decree should be granted."

AFFIRMED.

For appellant there was a brief over the name of *Messrs. Angell & Fisher,* with an oral argument by *Mr. Homer D. Angell.*

For respondent there was a brief over the name of *Messrs. Kimball & Ringo,* with an oral argument by *Mr. Ernest R. Ringo.*

BENNETT, J.—The court below came to the conclusion that the testimony on behalf of plaintiff was too weak to sustain a decree for a divorce, and in this we concur.

2. The evidence in the case seems to strongly support the contention of the plaintiff, that the defendant was at least at times somewhat untidy in her housekeeping and in caring for the children and herself, but we think that such untidiness under the circumstances would not be a just cause for a dissolution of the marriage bonds.

When plaintiff and defendant were married it is conceded by all parties that defendant was inexperienced in household matters. During the ten years of her married life with the plaintiff, she bore the plaintiff six children, so that they were, on an average, only a little more than eighteen months apart. It follows that there was only a small portion of the time when she was not either carrying an unborn child or nursing that child and recovering from the illness of childbirth. The plaintiff was running a large ranch, and had more or less hired men about the place all the time, and at some seasons of the year a considerable number. During a good part of the time the defendant did the work for the household, although she generally had help when there were a large number of men. However, it was no slight task at any time for a woman to keep house, cook for her husband and what men there were upon the place, and take care of her numerous small family. With such frequent increases in the family and the accompanying aggravations and disabilities it must have been a very severe trial. Under such circumstances it would not be strange if her housekeeping was not of the best, or if her children or herself sometimes were neglected in their personal appearance and condition.

No doubt this was sometimes annoying to the plaintiff, who seems to have been a man of rather unusual neatness, but he should have remembered that he was as much responsible as his wife for the rapid increase of the family, and the resulting conditions to her health.

People marry in this world for "worse" as well as for "better," and it is not often in the marriage relation that both parties do not find much in the way of fault in the other party which they had not expected

and which they must bear with patience what they cannot better by love and affection. We think there was nothing in the habits or conduct of the defendant in this regard, which even approximated "cruel and inhuman treatment," as defined by the authorities.

3. The most serious matter complained of by the plaintiff is the charge, or intimation, on the part of the defendant, that the plaintiff had been guilty of improper conduct with Mrs. Wineberger. It seems that a month or two before the separation, the defendant came downstairs one night after putting the children to bed, and while she was in the living-room, the plaintiff came out of the dining-room in his stocking feet, carrying his shoes. Mrs. Wineberger's room opened off of the dining-room at the left of the door as one came from the dining-room to the living-room. The kitchen and bathroom also opened off from the dining-room, and the door from the dining-room to the kitchen was almost directly opposite the door from the dining-room to the living-room.

The plaintiff claims he had been through the dining-room into the kitchen to get a drink before going to bed; but the defendant claims that from where she stood, she could see right through to the kitchen door; and that plaintiff did not come out of that door, but that he came from towards Mrs. Wineberger's room, and brushed against that side of the door as he came through into the living-room from the dining-room.

Mrs. Wineberger was a neighbor living on a homestead in one of plaintiff's pastures, and she and her husband were working for the plaintiff at that time. Her husband, however, had gone to town or off somewhere that day, and Mr. Parman and Mrs. Wineberger seem to have been the only persons in the lower part of the house at the time. After her hus-

band came through the room Mrs. Parman went into the dining-room and found the door leading from the dining-room into Mrs. Wineberger's room ajar. She opened the door and went into the room and shook Mrs. Wineberger, but got no response. Mrs. Wineberger either was, or pretended to be, so sound asleep that she could not be wakened in that way.

The plaintiff does not claim that Mrs. Parman accused him directly of improper relation. She says she did not.

"No, sir; I simply asked him the question if he had been in her room that night. Of course I suppose it was an intimation in a way that such a thing might have been. Mr. Parman evidently took it that way."

We agree with the trial court that there was no sufficient evidence of any improper relation between plaintiff and Mrs. Wineberger at that time to justify a finding against him in that regard. We also think, however, that Mrs. Parman had some reasonable ground for suspicion.

Mrs. Parman testifies that previous to that—

"I discovered along in the winter—I don't remember what time—Mrs. Wineberger was acting peculiarly with the men especially, and I went to Mr. Parman about it, and *he* decided that there were improper relations between them. I think he went to Mr. Wineberger about it and warned the men also."

So that, from her standpoint at least, Mrs. Wineberger was not a woman above all reproach.

Then again there had been another incident some time before, in which another hired girl accused the plaintiff of being too familiar with her in the presence of both plaintiff and defendant. Mr. Parman denies that there has been anything wrong between him and that girl, but he admits she made the accusa-

tion. Under these circumstances Mrs. Parman certainly had some reason to doubt whether her husband was above temptation in matters of this kind. If, as she testifies, she found her husband coming from the direction of Mrs. Wineberger's room, in his stocking feet, with his shoes in his hand, at a time when she was supposed to have retired, and when there was no one in that portion of the house but her husband and Mrs. Wineberger, and upon going to the room she found the door ajar, and Mrs. Wineberger pretending to sleep so soundly that she could not be wakened by shaking, it was natural that she should be somewhat disturbed by the circumstances.

4. It all happened at a time when Mrs. Parman was pregnant and expecting daily that her baby would be born. It is a well-known fact that under such circumstances women are more sensitive and more suspicious than they are at other times. Under such circumstances we cannot say that it was cruel and inhuman for her to express her doubts to her husband. Nor do we think it was sufficient reason, under all the circumstances, for the plaintiff to put her away from him and demand a separation, as he did about two weeks afterwards, when she must have been still sick from the loss of her baby, according to his own evidence.

It is urged on behalf of plaintiff that while no one of the acts complained of by plaintiff might be sufficient cause for divorce, yet altogether and in the aggregate they are sufficient, but we think not. The actions complained of cover a long period of time—about ten years—and they are gathered from time to time by witnesses who were generally hostile to the defendant.

After the defendant had lived with her husband on the farm near Condon for several years, the plaintiff's brother also moved upon the farm with his wife and one of plaintiff's sisters, and they continued to live on the farm for some years.  Naturally trouble grew between the women of the two families.  They quarreled about the management of the place, and there has been a very bitter feeling ever since.  Weighing their evidence in this light, taking into consideration all the circumstances, we do not think that any shortcomings of the defendant are sufficient to justify putting her away or granting a divorce.

The plaintiff cites the case of *Lisenby* v. *Lisenby,* 89 Or. 273 (173 Pac. 888).  But that case was a much stronger case for the plaintiff than the one at bar.  In the Lisenby case, according to the evidence of the plaintiff, the defendant had utterly refused to live with him, unless he lived in the house with her father and mother, and both she and her relatives in her presence had frequently sneered at him and talked insultingly to him.  When he finally asked her to go away from them and live with him she flatly refused; and at the trial when the court undertook to act as intermediary and to induce her to go back to her husband, who was willing to take her back, she again openly and flatly refused.

Here there are no such circumstances.  The defendant, on the other hand, testifies that she has never consented to a permanent separation, and she does not consent to such separation now, and announces herself as willing to continue the marriage relation.

The plaintiff, in his testimony, substantially admits that he has been the moving party in demanding a separation, and that his wife never did wish to separate.  It is true that she signed the agreement in

relation to the division of the property, but that was not a separation agreement, and the plaintiff seems to have been the moving party in the execution of that agreement, as well as in demanding the separation.

Even after this suit was brought the plaintiff and the defendant had at one time almost reconciled their differences and had agreed upon going back together to live, but they failed to agree upon a rearrangement of their property; and the plaintiff then decided to continue the divorce proceedings. The plaintiff demanded that as a condition of their remaining together the defendant repay to him the $5,000 he had turned over to her. She says she doubted his fairness in the matter and was not willing to do that, unless he would cause certain real property, to which she had signed deeds, to be deeded back to her and him jointly, which he refused to do. This does not seem an unreasonable requirement upon her part.

Upon the whole, the plaintiff and defendant seem to have lived together with reasonable happiness up at least until the year 1916. On March 13th of that year, upon the occasion of the loss of their fifth child, plaintiff wrote a letter to the defendant, running over with affection and winding up,

"Good-bye sweetheart, and remember that your husband thinks of you and *loves you every minute.*"

It is plain from this letter that their life together up to that time could not have been so very unhappy.

About this time, or shortly after the Wineberger woman moved into the neighborhood. Whether it is a simple coincidence that about that time the plaintiff commenced to have a coldness toward the defendant, we cannot say. It appears in evidence, however, that since the separation, which the plaintiff insisted

upon, he has been visiting and corresponding with Mrs. Wineberger. She remained at his house a short time after the defendant moved away, and afterwards the plaintiff visited her in Portland and took her out to a show and on an automobile excursion over to Vancouver. Afterwards she moved to Ashland and the plaintiff visited her there. It is due to him to say that he claims to have been up there on business matters, and this may be true; but he also says he has written her a number of letters since she left his place. In view of the fact that the trouble between himself and his wife was about this woman, it seems strange that he should have paid her so much attention.

5. Whether, now that she has passed out of the lives of plaintiff and defendant, and ceased to be a cause of friction, they can ever resume their happy marriage relations is a matter of conjecture, but we think the evidence in the case, on behalf of plaintiff, is too weak to justify a divorce decree in his favor. Decree affirmed.                                                           AFFIRMED.

BURNETT, J., concurs in the result.